# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **ELLIOTT MOODY,** | ) | |
| Plaintiff | ) | |
| | ) | |
| v. | ) | Civil Action No. 2:10cv00036 |
| | ) | **REPORT AND** |
| | ) | **RECOMMENDATION** |
| **MICHAEL J. ASTRUE**, | ) | |
| **Commissioner of Social Security,** | ) | By: PAMELA MEADE SARGENT |
| Defendant | ) | United States Magistrate Judge |

*I.  Background and Standard of Review*

Plaintiff, Elliott Moody, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), determining that he was not eligible for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. §§ 423, 1381 *et seq.*  (West 2003 & Supp. 2010). Jurisdiction of this court is pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3). This case is before the undersigned magistrate judge by referral pursuant to 28 U.S.C. § 636(b)(1)(B).  As directed by the order of referral, the undersigned now submits the following report and recommended disposition.

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as

"evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze,* 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Moody protectively filed his applications for DIB and SSI on July 26, 2006, alleging disability as of November 15, 2005, due to diabetes mellitus, depression and anxiety. (Record, ("R."), at 49-51, 63, 67, 86, 400-02.) The claims were denied initially and on reconsideration. (R. at 37-44, 48.) Moody then requested a hearing before an administrative law judge, ("ALJ"). (R. at 36.) The hearing was held on October 11, 2007, at which Moody was represented by counsel. (R. at 643-83.)

By decision dated December 26, 2007, the ALJ denied Moody's claims. (R. at 19-28.) The ALJ found that Moody met the nondisability insured status requirements of the Act for DIB purposes through September 30, 2007.[1] (R. at 21.) The ALJ also found that Moody had not engaged in substantial gainful activity since November 15, 2005, the alleged onset date. (R. at 21.) The ALJ determined that the medical evidence established that Moody suffered from severe impairments, including diabetes mellitus, depression and anxiety, but he found that Moody did not have an impairment or combination of impairments listed at or

---

[1] In order for Moody to be entitled to DIB benefits, he must demonstrate disability on or prior to September 30, 2007.

medically equal to one listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 21-22.)  The ALJ found that Moody had the residual functional capacity to perform unskilled, medium work[2] that allowed for a sit/stand option every 30 minutes, and which did not require the performance of tasks with detailed instructions. (R. at 23.)  The ALJ found that Moody was unable to perform his past relevant work.  (R. at 26.) Based on Moody's age, education, work history and residual functional capacity and the testimony of a vocational expert, the ALJ found that Moody could perform other jobs existing in significant numbers in the national economy, including jobs as a packer and an assembler. (R. at 26-27.) Therefore, the ALJ found that Moody was not under a disability as defined under the Act and was not eligible for benefits. (R. at 27-28.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2010).

After the ALJ issued his decision, Moody pursued his administrative appeals, (R. at 15), but the Appeals Council denied his request for review. (R. at 7-11.) Moody then filed this action seeking review of the ALJ's unfavorable decision, which now stands as the Commissioner's final decision. *See* 20 C.F.R. §§ 404.981, 416.1481 (2010). The case is before this court on Moody's motion for summary judgment filed November 12, 2010, and the Commissioner's motion for summary judgment filed February 11, 2011.

---

[2] Medium work involves lifting items weighing up to 50 pounds at a time with frequent lifting and carrying of items weighing up to 25 pounds.  If someone can perform medium work, he also can perform light and sedentary work.  *See* C.F.R. §§ 404.1567(c), 416.967(c) (2010).

## II. Facts and Analysis[3]

Moody was born in 1971, (R. at 49, 400), which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c). He obtained his general equivalency development, ("GED"), diploma, noting that he attended special education classes through elementary school. (R. at 73, 647-48.) He has past work experience as a machine operator, a caster, a roofing laborer and a tire recapper. (R. at 68, 95-100, 653, 656, 658-59.) Moody stated that he was diagnosed with diabetes mellitus in November 2005 and that his blood sugar levels remained unregulated. (R. at 654, 660.) He stated that when his blood sugar levels were high, he felt fidgety and got anxious. (R. at 660-61.) He stated that he also had difficulty walking due to fatigue and numbness in his legs and back. (R. at 661.) Moody further testified that sitting for 30 to 40 minutes made his legs go to sleep, which could be relieved by lying down and elevating his legs, and which he did up to two hours daily. (R. at 661.)

Moody testified that he took Lexapro for anxiety and depression, and he stated that he was seeing a counselor, which was "helping pretty good." (R. at 662.) Moody stated that he did not want to be around people, noting that he would go for three to four days without leaving his house, and that doing so sometimes triggered panic attacks. (R. at 663-64.) He testified that he had been hospitalized

---

[3] Moody must show disability for SSI purposes between November 15, 2005, the alleged onset date, and December 26, 2007, the date of the ALJ's decision. For DIB purposes, Moody must show disability between November 15, 2005, and September 30, 2007, the date last insured. Only the facts pertinent to these relevant time periods for determining disability are included in this Report and Recommendation.

in June 2006 for suicidal thoughts. (R. at 678.) Moody testified that he had not consumed alcohol in "quite a while," and he stated that he had not used illicit drugs in "over at least eight months." (R. at 666.)

John Newman, a vocational expert, also was present and testified at Moody's hearing. (R. at 665-78.) Newman classified Moody's past relevant work as a machine operator and as a caster as light[4] and unskilled and as a roofer and a tire recapper as heavy[5] and semiskilled. (R. at 665-66.) Newman testified that a hypothetical individual of Moody's age, education and work history, who could perform medium work with a sit/stand option every 30 minutes and who was moderately limited in nine areas of work-related mental functioning, as set forth in the mental residual functional capacity assessment completed by state agency psychologist, E. Hugh Tenison, Ph.D., on September 18, 2006, with a "moderate" limitation being defined as retaining a satisfactory ability to perform the particular task, could not perform any of Moody's past relevant work, but could perform other jobs existing in significant numbers in the national economy, including those of a packer and an assembler. (R. at 667-68.) Newman was asked to consider the same hypothetical individual who also had the restrictions set forth in a symptom checklist completed by Miranda Eggleston, a social worker at Highlands

---

[4] Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting and carrying of items weighing up to 10 pounds. If someone can perform light work, he also can perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2010).

[5] Heavy work involves lifting items weighing up to 100 pounds at a time with frequent lifting and carrying of items weighing up to 50 pounds. If someone can perform heavy work, he also can perform medium, light and sedentary work. *See* 20 C.F.R. §§ 404.1567(d), 416.967(d) (2010).

Community Services, on June 28, 2006.  (R. at 668-69.)  Newman testified that such an individual likely could not succeed long-term in the jobs previously listed. (R. at 669-75.)  Newman next testified that an individual with a Global Assessment of Functioning, ("GAF"),[6] score of 49[7] could not work. (R. at 677.) Newman further testified that the maximum tolerated rate of absenteeism is about one day monthly. (R. at 678.)

In rendering his decision, the ALJ reviewed records from Wellmont Bristol Regional Medical Center; Johnston Memorial Hospital; Saltville Medical Center; Dr. Joseph Duckwall, M.D., a state agency physician; E. Hugh Tenison, Ph.D., a state agency psychologist; Dr. Richard Surrusco, M.D., a state agency physician; Howard S. Leizer, Ph.D., a state agency psychologist; Highlands Community Services; Kathy Jo Miller, M.Ed., a licensed psychological examiner; and Robert S. Spangler, Ed.D., a licensed psychologist. Moody's attorney submitted additional medical records from Highlands Community Services; Stone Mountain Health Services / Holston Family Health Center; Johnston Memorial Hospital; and Blue Ridge Orthopedic to the Appeals Council.[8]

---

[6] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (AMERICAN PSYCHIATRIC ASSOCIATION 1994).

[7] A GAF score of 41 to 50 indicates  "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning. . . ." DSM-IV at 32.

[8] Since the Appeals Council considered these records in deciding not to grant review, (R. at 7-11), this court also must consider this evidence in determining whether substantial evidence supports the ALJ's findings.  *See Wilkins v. Sec'y of Health & Human Servs.*, 953 F.2d 93, 96 (4th Cir. 1991).  However, I note that some of the evidence considered by the Appeals Council

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2010); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). This process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920. If the Commissioner finds conclusively that a claimant is or is not disabled at any point in this process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2010).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2010); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

---

does not relate to the period on or before the date of the ALJ's decision. That being the case, this court will consider only the evidence submitted to the Appeals Council that does so relate. *See* 20 C.F.R. §§ 404.970(b), 415.1570(b) (2010) (stating that if new and material evidence is submitted to the Appeals Council, it shall be considered only insofar as it relates to the period on or before the date of the ALJ's hearing decision); *see also McGinnis v. Astrue*, 709 F. Supp. 2d 468, 471 (W.D. Va. 2010).

Moody argues that the ALJ erred in both his mental and physical residual functional capacity findings. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 7-13.) Specifically, Moody argues that the ALJ erred by finding that his only work-related mental impairments were an inability to perform skilled work or to perform tasks requiring detailed instructions. (Plaintiff's Brief at 7-13.) Moody also argues that the ALJ erred by formulating his own residual functional capacity finding, rather than adopting one from a medical source. (Plaintiff's Brief at 13-15.) Lastly, Moody argues that the ALJ erred by failing to order a consultative examination. (Plaintiff's Brief at 15-16.)

As stated above, the court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays*, 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Furthermore, while an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980),

an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Moody argues that the ALJ erred in both his physical and mental residual functional capacity findings. (Plaintiff's Brief at 7-13.) For the reasons that follow, I agree that substantial evidence does not support the ALJ's physical residual functional capacity finding. The ALJ found that Moody suffered from severe diabetes mellitus, concluding that he could lift and carry items weighing up to 50 pounds occasionally and up to 25 pounds frequently, that he could stand and/or walk for six hours in an eight-hour workday, but for only 20 minutes without interruption, that he could sit for six hours in an eight-hour workday and that he needed to alternate between sitting and standing every 30 minutes. (R. at 23.) The only opinions of record containing any assessment of Moody's physical limitations on his ability to work were from the state agency physicians, Dr. Joseph Duckwall, M.D., and Dr. Richard Surrusco, M.D., completed on September 14, 2006, and January 16, 2007, respectively. (R. at 242-47, 310-16.) Both Dr. Duckwall and Dr. Surrusco concluded that Moody's only work-related physical limitation was the need to avoid all exposure to hazards, such as heights or machinery. (R. at 245, 313.) They also both noted that there was no treating or examining source statement regarding Moody's physical capacities in the file for review. (R. at 246, 314.)

However, as Moody notes, the ALJ failed to include this sole limitation found by both state agency physicians. Moreover, despite the fact that the state agency physicians imposed no exertional limitation on Moody, and despite the lack of any other medical records addressing Moody's physical limitations, the ALJ, nonetheless, imposed physical restrictions on him. While it could be argued that this was simply the ALJ giving Moody the benefit of the doubt, the fact remains that, under these circumstances, the ALJ improperly substituted his opinion for that of a trained medical professional in determining Moody's physical residual functional capacity. *See Grimmett v. Heckler*, 607 F. Supp. 502, 503 (S.D. W. Va. 1985) (citing *McLain*, 715 F.2d at 869; *Oppenheim v.* Finch, 495 F.2d 396, 397 (4th Cir. 1974)). Therefore, I recommend that this case be remanded to the ALJ for further consideration of Moody's physical residual functional capacity, including obtaining a consultative examination to evaluate the same. I specifically find that such a consultative examination is appropriate under the circumstances because the ALJ rejected the only physical residual functional capacity findings contained in the record.[9] Therefore, remanding the case to the ALJ for a determination of physical residual functional capacity would be futile unless such an evaluation is obtained.

---

[9] The Regulations require that the medical evidence be "complete" enough to make a determination regarding the nature and effect of the claimed disability, the duration of the disability and *the claimant's residual functional capacity*. *See* 20 C.F.R. §§ 404.1513(e), 416.913(e) (2010) (emphasis added). The regulations further provide that a consultative examination may be purchased when the evidence, as a whole, is not sufficient to support a decision on your claim, when the additional evidence needed is not contained in the records of the claimant's medical sources and when an insufficiency in the evidence must be resolved and that cannot be done by recontacting the claimant's medical source. *See* 20 C.F.R. §§ 404.1519a(b), 416.919a(b) (2010).

Finally, I find Moody's argument that the ALJ erred in his mental residual functional capacity determination unpersuasive. The ALJ concluded that Moody suffered from severe anxiety and depression, finding that he could perform unskilled work that did not require the performance of tasks requiring detailed instructions. (R. at 23.) The ALJ further specifically noted that Moody was moderately[10] limited in his ability to understand, remember and carry out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances; sustain an ordinary routine without special supervision; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; respond appropriately to changes in the work setting; and set realistic goals or make plans independently of others. (R. at 23.) In arriving at his mental residual functional capacity finding, the ALJ stated that he was giving greater weight to the opinions of Kathy Jo Miller, M.Ed., a licensed psychological examiner, and Robert S. Spangler, Ed.D., a licensed psychologist, who performed a consultative psychological evaluation of Moody on November 6, 2007, as well as the opinions of the state agency psychologists, E. Hugh Tenison, Ph.D., and Howard S. Leizer, Ph.D., dated September 14, 2006, and January 24, 2007, respectively. (R. at 26.) The ALJ specifically stated that he was giving little weight to the checklist of symptoms, completed on June 28, 2006, by Miranda Eggleston, a social worker at Highlands Community Services, where Moody received counseling services from June 28, 2006, to August 29, 2007. (R. at 26.)

---

[10] The ALJ defined a "moderate" limitation as having some functional limitation, but still being able to perform a task satisfactorily. (R. at 23.)

Moody argues that the ALJ erred in his mental residual functional capacity determination by not finding that he had moderate limitations in these nine areas. Specifically, Moody argues that, although the ALJ listed these nine areas of moderate limitation in his residual functional capacity finding, the only work-related mental limitations that he actually imposed were an inability to perform skilled work and an inability to perform tasks that required detailed instructions. I find that, regardless of whether the ALJ erred in the actual wording of his residual functional capacity finding, any such error was harmless, as he specifically included these nine moderate limitations in his hypothetical to the vocational expert, who testified that such an individual could perform jobs existing in significant numbers in the national economy. More specifically, the ALJ's finding that Moody can perform other jobs existing in significant numbers in the national economy, thereby making him not disabled, is based on the following hypothetical to the vocational expert:

ALJ:     . . . He has nine areas of what are called, moderate limitation, on the mental residual functional capacity form. Moderate is defined as satisfactory. . . . And these areas are working with detail, attention and concentration, schedules, routine, public interaction, supervision, changes, goals. . . . Okay. Is there any entry-level work?

VE:     Yes, sir, very narrow, but yet still viable occupational base. . . . One, a packer . . . . And for the second category, I would suggest assemblers. . . .

(R. at 667-68.)

Moody next argues that the ALJ erred by defining a "moderate" limitation as retaining a "satisfactory" ability in that particular area. I disagree. The ALJ stated that he was using the definition of "moderate" contained in the Mental Residual Functional Capacity Assessments. (R. at 667.) This is not correct, as this definition of "moderate" was contained in the Medical Source Statement completed by Miller and Spangler. In fact, "moderate" was not defined at all in the Mental Residual Functional Capacity Assessments. The Medical Source Statement from which the ALJ derived the definition of "moderate," as well as the Mental Residual Functional Capacity Assessments, are Social Security Administration forms used by health care professionals to rate the severity of limitation on an individual's ability to perform the work-related mental activities enumerated therein. On the Medical Source Statement, a "moderate" limitation is defined as "more than a slight limitation in [the] area, but the individual is still able to function satisfactorily." (R. at 397.) "Moderate" is not defined in the Social Security Regulations, and I have been able to locate no binding case law on the subject. Finally, I note that Webster's Ninth New College Dictionary defines "moderate" to mean "avoiding extremes of behavior or expression : observing reasonable limits" and "tending toward the mean or average amount or dimension." Therefore, I find that, given the lack of a definition of "moderate" in the Regulations, the inclusion of such definition on another Social Security Administration form and the ordinary meaning of the word "moderate," the ALJ did not err by defining a "moderate" limitation as retaining a "satisfactory" ability to perform a task.

All of this being said, I further find, for the following reasons, that the ALJ's mental residual functional capacity finding takes into account all of Moody's

limitations that are supported by the medical evidence and, therefore, it is supported by substantial evidence. First, the record shows that Moody was prescribed Effexor in March 2006 by Sally Pennings, a family nurse practitioner at Saltville Medical Center, who diagnosed major situational depression. (R. at 240.) While the record shows that Moody was psychiatrically hospitalized on June 20, 2006, with suicidal ideation and plan, and with a GAF score upon admission of 25,[11] the record also shows that this was during a time when Moody was abusing alcohol and illicit drugs. Although Moody later denied to Miller that he was using drugs and alcohol at the time of this hospitalization, records from Johnston Memorial Hospital, ("JMH"), and Ridgeview Pavilion show that he was intoxicated, and a urine screen was positive for marijuana and benzodiazepines. (R. at 159, 165, 171.) Dr. Mark Laty, M.D., diagnosed Moody with a mood disorder, not otherwise specified, alcohol dependence and marijuana dependence, and he rated Moody's prognosis fair with treatment. (R. at 164-65.) These records further show that once Moody was detoxified from these substances, his condition improved, and upon discharge on June 26, 2006, his GAF score was assessed at 70,[12] and Dr. Laty reported that he was doing "very well." (R. at 159.) At that time, Dr. Laty diagnosed polysubstance dependence, alcohol-induced mood disorder and the need to rule out mood disorder. (R. at 159.) There is no conclusive evidence in the record that Moody continued to use alcohol and/or drugs after this

---

[11] A GAF score of 21 to 30 indicates that the individual's "[b]ehavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment . . . OR inability to function in almost all areas. . . ." DSM-IV at 32.

[12] A GAF score of 61 to 70 indicates "[s]ome mild symptoms . . . OR some difficulty in social, occupational, or school functioning . . . but generally functioning pretty well, has some meaningful interpersonal relationships." DSM-IV at 32.

hospitalization, and following this hospitalization Moody consistently reported to his health care providers that he had stopped using drugs and alcohol.

As noted above, Moody received counseling at Highlands Community Services from June 28, 2006, to August 29, 2007. (R. at 134-53, 334-49.) Over this time, it appears that Moody's depression and anxiety stemmed from various situational stressors, including his diagnosis of diabetes mellitus, his 13-year-old daughter, with whom he had no relationship, coming back into his life, an upcoming court date regarding unpaid child support, being served with divorce papers and his girlfriend's ill aunt moving in with them. (R. at 134-53, 334-49.) On July 5, 2006, Moody's mental status examination was unremarkable, and Eggleston assessed his GAF score at 51.[13]  (R. at 144, 149-50.)  She diagnosed moderate major depressive disorder, single episode.  (R. at 151.)  From July 6, 2006, through August 31, 2006, Moody consistently reported that his sleep, appetite, energy and concentration were within normal limits, he was experiencing no crying spells or irritability, he was experiencing only mild depression, no anxiety or panic attacks and no suicidal or homicidal ideations.  (R. at 134-38.)

Although Moody was seen in the emergency department at JMH on July 17, 2006, with complaints of depression and suicidal ideation, he was discharged home in stable condition. (R. at 180.) Later that month, he complained of severe

---

[13] A GAF score of 51 to 60 indicates "[m]oderate symptoms . . . OR moderate difficulty in social, occupational, or school functioning. . . ."  DSM-IV at 32.

depression to Dr. Elmore, M.D.,[14] at Saltville Medical Center, but reported that he had stopped taking Effexor because it made him more nervous. (R. at 239.) Moody had a considerably depressed affect, stating that he was reconnecting with his daughter whom he had not seen in 11 years and also that he was being prosecuted for failure to pay child support. (R. at 239.) Dr. Elmore prescribed Lexapro. (R. at 239.)

On September 18, 2006, Tenison completed the Mental Residual Functional Capacity Assessment discussed above, concluding that Moody was moderately limited in the previously enumerated nine areas. (R. at 248-50.) The same day, he completed a Psychiatric Review Technique form, ("PRTF"), finding that Moody had an affective disorder and a substance addiction disorder, not otherwise specified, versus a substance-induced mood disorder and polysubstance abuse. (R. at 254, 259.) He concluded that Moody was only mildly restricted in his activities of daily living, experienced mild difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence or pace. (R. at 261.) He further found that Moody had experienced one or two episodes of decompensation, each of extended duration. (R. at 261.)

On September 28, 2006, Moody presented to the emergency department at JMH with complaints of an anxiety attack, chest pain and chest pressure. (R. at 265-73.) A chest x-ray and EKG were normal. (R. at 268-70.) He was given Clonidine and Vistaril and discharged in stable condition. (R. at 265, 267.)

---

[14] Dr. Elmore's first name is not contained in the record.

On January 24, 2007, Leizer completed a Mental Residual Functional Capacity Assessment and PRTF identical to those completed by Tenison on September 18, 2006. (R. at 317-33.) There are no further records pertaining to Moody's mental impairments until August 16, 2007, when Mark Morgan, MA, CSAC at Highlands Community Services, completed an Individual Service Plan for him. (R. at 334-45.) At that time, a mental status examination showed only mild distress, slowed motor activity, slightly impaired attention and concentration, intact memory, low average intelligence, impaired insight, normal thought process and thought content, no delusions, no suicidal or homicidal ideations, intact abstraction and an appropriate affect. (R. at 343-44.) Morgan noted that Moody appeared depressed and frustrated, and he diagnosed panic disorder with agoraphobia and dysthymic disorder, and he placed Moody's GAF score at 49.[15] (R. at 344-45.)

On August 22, 2007, Moody began seeing Stacy Field, BS, an intern at Highlands Community Services, for counseling, at which time he reported severe anxiety, depression and panic attacks around crowds. (R. at 348.) He also reported that he had been served divorce papers three days previously, which angered him. (R. at 348.)

Moody saw Kathy Jo Miller, M.Ed., a licensed psychological examiner, and Robert S. Spangler, Ed.D., a licensed psychologist, on November 6, 2007, for a consultative psychological evaluation. (R. at 389-96.) He reported having stopped

---

[15] A GAF score of 41 to 50 indicates "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning. . . ." DSM-IV at 32.

using alcohol eight or nine months previously. (R. at 389.) Moody generally understood testing instructions and demonstrated good concentration. (R. at 390.) He reported depression and anxiety for the previous year, and he described panic attacks. (R. at 390.) He reported his June 2006 psychiatric hospitalization, but stated that he was admitted under the pretenses of a drug and alcohol problem, which he vehemently denied to Miller and Spangler. (R. at 390.) He reported that although Lexapro helped initially, it no longer did so. (R. at 391.) However, he reported that his doctor was considering changing his medication or increasing his dosage. (R. at 391.) He denied suicidal or homicidal ideations. (R. at 391.)

Mental status examination was generally unremarkable, showing that Moody was alert and oriented with a mildly restricted affect, that he was of average intelligence and emotionally fairly stable on his then-current medications. (R. at 391-92.) Moody reported getting up each morning by 6:00, making coffee, smoking cigarettes and watching the morning news. (R. at 392.) He further reported washing dishes and placing washed clothes in the dryer. (R. at 392.) He stated that he drove his girlfriend to and from work five days a week and occasionally vacuemed at her request. (R. at 392.) Moody stated that he sometimes mowed the yard and drove his girlfriend to the grocery store. (R. at 392.) He reported visiting two friends several times monthly. (R. at 392.) Moody's social skills were deemed adequate, he communicated in a clear and coherent manner and he was deemed to have the judgment necessary to handle his own financial affairs. (R. at 392-93.)

The Wechsler Adult Intelligence Scale – Third Edition, ("WAIS-III"), test was administered, and Moody obtained a verbal IQ score of 82, a performance IQ score of 83 and a full-scale IQ score of 80, placing him in the lower limits of the low average range of intelligence. (R. at 394.) The Wide Range Achievement Test – Fourth Edition, ("WRAT-IV"), also was administered, showing that Moody's reading ability was at the 5.4 grade level, his sentence comprehension at the 3.6 grade level and his arithmetic computation at the 3.5 grade level. (R. at 394.) Moody's scores on the Wechsler Memory Scale – Third Edition, ("WMS-III"), all were in the low average to average range. (R. at 394.) Miller and Spangler diagnosed panic disorder with agoraphobia, under fair pharmacological control; dysthymic disorder, mild with medication; polysubstance dependence in full sustained remission; and low average intellectual functioning. (R. at 395.) Moody's GAF score was placed at 60. (R. at 395.) His prognosis was deemed adequate with medication and continued mental health intervention. (R. at 395.)

Miller and Spangler also completed the Medical Source Statement Of Ability To Do Work-Related Activities (Mental), discussed above, finding that Moody was moderately limited in his ability to interact appropriately with the public, with supervisors and with co-workers and to respond appropriately to usual work situations and to changes in a routine work setting. (R. at 397-99.) They found that Moody was mildly limited in his ability to understand, remember and carry out complex instructions and to make judgments on complex work-related decisions, with "mild" being defined as "a slight limitation in this area, but the individual can generally function well." (R. at 397.) Miller and Spangler based their findings on Moody functioning in the lower limits of the low average range of

intelligence, his low average memory scores, his tendency to isolate, his paranoia of panic attacks in public places and his present need for a medication change or dosage increase. (R. at 397-98.) They further noted Moody's report that he had not abused any substances for the previous eight or nine months. (R. at 398.) They concluded that Moody could manage benefits in his own best interest. (R. at 399.)

I find that the ALJ's mental residual functional capacity assessment is supported by substantial evidence. Specifically, since Moody stopped abusing drugs and alcohol, his mental status examinations have been relatively benign, his symptoms have been reasonably controlled with medication, and the objective testing by Miller and Spangler yielded relatively benign findings. I also find that the ALJ's mental residual functional capacity finding is further supported by Moody's activities of daily living, which include performing minor household chores, occasionally mowing the yard, driving his girlfriend to and from work five days per week and occasionally to the grocery store and visiting friends several times monthly. All of this being said, I find that the ALJ's rejection of Eggleston's symptomatology checklist, as well as Morgan's assessment of Moody's GAF score of 49 on August 16, 2007, is supported by substantial evidence, as they are contradicted by the other substantial evidence of record just mentioned.

It is for all of these reasons that I recommend that the court deny Moody's and the Commissioner's motions for summary judgment, vacate the decision of the Commissioner denying benefits and remand the case to the Commissioner for further development consistent with this decision.

# PROPOSED FINDINGS OF FACT

As supplemented by the above summary and analysis, the undersigned now submits the following formal findings, conclusions and recommendations:

1. Substantial evidence does not exist in the record to support the ALJ's physical residual functional capacity finding;

2. Substantial evidence exists in the record to support the ALJ's mental residual functional capacity finding;

3. Substantial evidence does not exist in the record to support the ALJ's finding that Moody could perform other jobs existing in significant numbers in the national economy; and

4. Substantial evidence does not exist in the record to support the ALJ's finding that Moody was not disabled under the Act and was not entitled to DIB or SSI benefits.

## RECOMMENDED DISPOSITION

The undersigned recommends that the court deny Moody's and the Commissioner's motions for summary judgment, vacate the Commissioner's decision denying benefits and remand Moody's claims to the Commissioner for further consideration consistent with this Report and Recommendation.

## <u>Notice to Parties</u>

Notice is hereby given to the parties of the provisions of 28 U.S.C.A. § 636(b)(1)(C) (West 2006 & Supp. 2010):

Within fourteen days after being served with a copy [of this Report and Recommendation], any party may serve and file written objections to such proposed findings and recommendations as provided by rules of court. A judge of the court shall make a de novo determination of those portions of the report or specified proposed findings or recommendations to which objection is made. A judge of the court may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge. The judge may also receive further evidence or recommit the matter to the magistrate judge with instructions.

Failure to file timely written objections to these proposed findings and recommendations within 14 days could waive appellate review. At the conclusion of the 14-day period, the Clerk is directed to transmit the record in this matter to the Honorable James P. Jones, United States District Judge.

The Clerk is directed to send certified copies of this Report and Recommendation to all counsel of record at this time.

DATED:     April 6, 2011.

/s/   *Pamela Meade Sargent*
UNITED STATES MAGISTRATE JUDGE